Mr. Hicks. Thank you, Your Honor, and may it please the Court. In March 2011, Appellant Joseph Cooney went completely blind in one eye. As a result of that unexpected loss of sight, Mr. Cooney experienced substantial limitations in his ability to read, walk, and drive. Given his sudden disability, Mr. Cooney sought a modest accommodation from Barry Law School to extend the time in which he was required to submit an appellate brief for class. The school refused any accommodation whatsoever regarding the brief. That refusal violated the Americans with Disabilities Act. In nevertheless granting summary judgment to Barry, the District Court committed multiple errors of law that require this Court to vacate and remand. First and foremost, in concluding that Mr. Barry was not actually disabled, the District Court failed to account for the 2008 amendments to the ADA instead analyzing Mr. Cooney's disability under pre-amendment cases. But as this Court observed in the Mazzeo decision in 2014, the 2008 amendments were specifically enacted to broaden the construction of disability and make clear that establishing actual disability is not meant to be demanding. Indeed, the Supreme Court, even before those amendments, observed in the Albertsons case that people with monocular vision like Mr. Cooney, quote, ordinarily will meet the Act's definition of disability, end quote. Following the 2008, yes sir. If my brother and sister will permit me, I frankly think you're putting it right on that score and the closer issue is whether or not the school was reasonable in denying the accommodation about the brief extension. May I go ahead and take them straight to that? My law clerk could not find in the record what the date of the brief deadline was and how long between the brief deadline and the oral arguments that were scheduled and how long the oral arguments were going to go. Your briefs say that there was several consecutive days of oral argument, but they don't tell us when. It seems to me crucial to know how much time is involved there from the brief deadline to the beginning of oral arguments to the end of the oral arguments. What does the record show, if anything? Sure, Your Honor. Just a couple points in response to that. Number one, I don't know if the record is very clear on that particular point about the precise calendar of brief deadlines and crucial thing is how long, how long. Yes, I don't know if the record is clear on that, but what I would say is that the rebuttal put forth by Barry is that even a single day of an extension would have been impossible because of the circumstances, because of supposedly being able to give an other student who had the appellate brief. And with all candor, a couple of responses. Number one, you know, I don't think that particularly at the summary judgment stage that that's something that— Well, your client has a burden of proof, and the professor said she could not give him the extension because of the oral argument date was a date certain and already set. If there were only a couple of days between or even a week maybe between the deadline for the briefs and the beginning of the oral argument, especially if the oral arguments only went for a couple of days, and especially in light of your client's testimony and deposition that he would have needed a week or ten days, I'm not sure you've enough evidence to get over the deference that we owe to the professor. That's my concern anyway. A couple points, your honor. Number one, I do think it's Barry's motion for— My concern as well because it involves another student. He was going to have an oral argument with another student, so that had to be—it wasn't just filing a brief. Yes, your honor, but a couple points if I may. Number one, I think that, number one, first of all, it was Barry's motion for summary judgment, so while I understand there is a burden on my client, I think there's also a burden on Barry to put forth evidence that somehow would have negated that particular concern that you have. Number two, in relation to the specific circumstances here, I particularly don't think it's that unreasonable to ask for another student. It isn't as if there could be one day or two days later that that other student couldn't submit a particular brief. I mean, if you think about the circumstances of where this is, there is record evidence that the oral arguments were scheduled over a number of days. How many? Do we know that? I don't know the exact number, your honor, but the record does say it is over several days, and it is not as if that other student was getting some sort of advantage. I mean, the brief would have been turned in, presumably, to the professor, not to Mr. Cooney. It's not as if he would have seen it. It's not as if the students were going—these two students were going to see everyone else's briefs in summary. And again, it was on summary, so we don't know how many days, but if it were a week, they just put Mr. Cooney and his partner on the last day, and then, as you suggest— I think so, your honor. I don't think that's a great imposition. The ADA states that an institution, if it can show undue hardship, need not make a reasonable accommodation, and with all respect, I just don't think that that is a great undue hardship. If you look the statute and the regulations, it talks about an extraordinary financial burden, a significant burden. I just don't think this rises to that level. I would also like to make a quick point about this idea of deference to the institution. There are certainly cases that talk about granting deference to universities' academic decisions, academic standards. However, those cases are in the context where the ADA plaintiff, or often a due process plaintiff, is trying really to sort of effect wholesale structural changes to the entire academic program. For example, saying, well, I know that, say, you know, 1.5 is the GPA cutoff, but I would like it to be 1.25. Is there any evidence in this record that he was treated substantially different from others who are disabled? I think there is a record in the evidence on that regarding particularly count two, and I think Mr. Cooney is going to be addressing count two in that respect, but I don't think that that's something that for count one or counts three and four is relevant. And just to return to my point about deference, I'm sorry. I say it is relevant how they treated other people similarly situated. With all respect, Your Honor, I don't know. How is time effacing cases creates a presumption under McDonnell Douglas? Well, I don't know if for purpose of creating a prime efficient case that differential treatment as compared to other disabled students may matter. I think that it applies in private education just as well as it applies everywhere else. Oh, that's absolutely right. And that's actually my point about deference, which is if we're inclined to give deference, it might be in the sort of academic standard situation. All I want to know, is there any evidence at all as to how they treat other people who are disabled in those circumstances? I actually believe there is record evidence, Your Honor. What is it? It regards the other students that had gone to the disability center. Were there other students by name? Well, they were not named in the record for personal reasons, but they are identified as student one and student two. Were they identified so that somebody would know who they were? Well, not in the sense of. Other than just conclusion that there were other students. Yes, yes. They are individually set out in the record. They're just not identified personally for privacy reasons. I've got another question. I want to ask you a question about the third issue, the extension of extended probation and the dismissal. They kind of go together. As I understand from the record, your client did not tell the committee that made this decision that he had been denied the accommodation with respect to the briefing so that that committee, as I understand it, was wholly ignorant of that fact and in effect knew only that he had fallen below the necessary grades for two straight semesters. Which under the student handbook called for the dismissal such that even the draft letter that does indicate a causal connection between his disability and the and the actions of the committee. But on the other hand, it is merely a statement which was absolutely obviously true if they did not know about the denial of accommodation. They assuming he had all the accommodations he asked for and still couldn't make it. In other words, he was not otherwise qualified. Isn't that true? Well, your Honor, a couple of points. First of all, as we set forth in the supplemental brief, that's not even a question you have to reach if you vacate and remand on count one, because without that, they don't get to the point of the supplemental. Suppose the failure to file the brief or the give him an accommodation would have made any difference at all. Suppose he would have been dismissed from the law school regardless of the claim for the failure to accommodate the brief situation. That is to say the question becomes to what extent is the brief issue implicated in the Well, I think it is, number one, because without that particular issue, that's what gets you the grade that leads to him being under the 2.0 cumulative GPA that renders him not otherwise qualified. So we're not even in the count three and four bucket if you vacate and remand on count one. So number two, to respond to Judge Anderson's question, you know, I think there's a about because of his disability, because of his condition that they asked about during the meeting as well. I mean, I think that it's not just the letter, that there's record evidence. Obviously, they're concerned about that. Yes, obviously they are. And again, you know, if we're before a jury, you know, maybe there are jury arguments one side or another. But I think at the summary judgment stage, when you're looking at Well, I don't know if they don't know. And I assume from your answer to my question that there is no knowledge, no evidence that the committee knew he had requested an accommodation which had been denied. Am I right? But I think that I don't know if the record is clear on that. But I do think that he did himself testify. He did not tell them. That's true. That particular facet to the committee. But by that point at the committee, it's more a question about his overall disability and not any one particular accommodation. Let me be sure. I think there's no evidence at all that the committee knew that he had been denied that requested accommodation. True or not? I believe that's true. But I think it is also immaterial to their determination about the disability. I think that that means that there is no violation with respect to Issue 3 all by itself. Hopefully, aside from one, because that was just a mere statement. Even the draft letter that says he's got these disabilities and with these disabilities, he can't make it. He can't make the grade. That's just a statement that he's not otherwise qualified. But with all respects, I think there's another way to look at it. I think a jury might look at it. But again, I don't even think we need to get there because of count one. I think I agree with you that if he prevails on count one, the remedy may well include vacation of the decision about extended probation because that would be an appropriate remedy for not having made the accommodation that was required under the law if he prevails on one. I think I agree with you on that. It's not moot. But you could prevail through remedy anyway, possibly. That would be a matter that the district court would have to ... Yeah. Well, that would be fine as well. You've saved some rebuttal time. Your Honor. Mr. Cooney. Good morning. It's a pleasure to court. I'm Appellant Joseph Cooney. I'm claiming the lower court erroneously concluded that I was not denied access to the academic success director, Lisa Kirst, since I allegedly only had to meet with her once and no further analysis was required. When I first met with the academic success director, Lisa Kirst, she told me that we would be meeting on a regular basis on a weekly or a biweekly rate. And that it was a requirement of my regular probation. When I went to her office on September 15th, Kirst brought up ... I told her about my eye injury and she brought up if I was going to have to do a surgery to have the eyesight restored. And I said, no, because it would take months and I would have to leave school now and I couldn't continue and I already paid my tuition, et cetera. But then she became very agitated and she said, I recommend you take a leave of absence to have the eye fixed and then come back to school. And I disagreed with her. When I told her this, she was, again, very confrontational with me and aggravated. And she said, we're done. You can go now. I said, we're done. She goes, yes, you don't have to come back anymore. The way she treated me with such hostility, I was actually relieved that I didn't have to see this woman ever again. The defendant stated in the motion for summary judgment that a student only had to meet with the academic success director one time while on probation. Lisa Kerr stated to me to the contrary, directly to me that we had to meet on a regular basis as other students also stated the same as in the affidavit of Mr. Joshua Irwin who had to meet them on a regular basis. And he had a poor interaction with Lisa Kerr too. And she actually directly conveyed to him that disabled students do not belong in law school. And Mr. Kerr went on to submit a charge with the Office of Civil Rights and there was a settlement. So the veracity of his claim has some authenticity based on the settlement with Mr. Irwin. Mr. Irwin also went to see Susan Bendlin about the complaint with Lisa Kerr. And Lisa Kerr, Susan Bendlin, then in my case, when I tried to depose her, a defendant said she didn't work there anymore all of a sudden. And I couldn't get my subpoenas in because I guess they tipped her off. I couldn't get service. And then in the hearing in regard to with the magistrate about my motion about in September, the magistrate directly asked attorney for Jackson Lewis, Amanda Simpson, will you provide Carlo Pedrioli and Susan Bendlin for deposition? And they outrightly denied it. They said, no, we will not produce them. I mean, why would they not produce them? Because they didn't want this issue to continue in an oral examination. The terms in the probation are clear, defendant states. Once a student receives notice that he is a mandated or discretionary probation, he must meet promptly with the director of the academic success program who shall determine what measures may improve the student's academic performance. Mr. Cooney, your time is on the way. So if... You have to bring your remarks to a close. Okay. I wanted to say in regard to this issue, it would take more than one meeting for someone to determine measures for what measures would be required to improve the student. You can't just meet someone one time, wave a magic wand and say, now you're going to pass. So it's not reasonable to actually believe that you'd have to meet with her one time. And it was throughout campus. Everybody was complaining about the woman's, you know, being hostile to people. And I believe she had a certain hostility towards disabled students. And I'll tell you my theory why. It's because they're afraid of the bar passage rate and they think that disabled... Mr. Cooney, you saved some rebuttal time. Okay. Thank you. Mr. Nagel. May it please the court. My name is David Nagel of the Richmond, Virginia Bar. I'm with the firm Jackson Lewis, although I was not involved during the district court proceedings or even the briefing at this court. It's my pleasure to be with you today. First, not to get your law clerk in any trouble, Judge Anderson, I would draw your attention to document 140-6, page 2. It was an attachment to the plaintiff's response to the school's motion for summary judgment. And what he attached there is what has the handwritten notation of McGowell's syllabus. And it shows specifically that on Monday, April 4th, two hard copies of the appellate brief are due on Monday, April 4th, no later than 7 p.m. No class on Wednesday, the 6th. And oral arguments are Friday, Saturday, and Sunday, April 8th, 9th, and 10th. So, what we have is six days between the deadline of the 4th and the end of the oral arguments on the 10th. We have six days to play with. And while it is certainly possible that Mr. Cooney was confused over the date of his request, I'll point out that the first indication that he was requesting something with respect to that class is the email that he sent on the morning of April 8th. You'll recall that the exchange of emails was with respect to his desire to wear sunglasses during oral argument. The professor immediately granted that. Mr. Cooney's deposition testimony is that after that email exchange, he went to her about seeking additional time on the brief. Well, that means at that point, the brief was already overdue. I acknowledge that, Your Honor, and that's an inconsistency in the testimony. But I think it certainly does not suggest that the request had been made in any manner that would have provided the ease with which Mr. Hicks suggests that the whole oral argument calendar could have been rearranged. If it was a few days before he sent the email about the sunglasses, maybe it was only a few days prior to that. But it was certainly in a very short period of time. But the point, I mean, the question is, was the accommodation that he requested reasonable and could it have been, could he have been accommodated? And this seems like a really fact-intensive kind of discussion to be having on a summary judgment. Your Honor, I would submit that we look to the reasonableness, both of the request and the hardship that it's caused. His evidence seems to suggest that he didn't make the request and he never reduced it to writing. And in fact, Professor McGowell, in her declaration, said she never remembered any request from him. His complaint, if you look at both his original complaint and first and second amended complaint, does not assert that he requested, that he requested that accommodation. He rather says in his complaint that Professor McGowell didn't offer an accommodation of additional time on it. So with respect to Mr. Cooney's obligation to put forward evidence of his request, I think that the reasonableness of an accommodation includes consideration of the reasonableness of the request, the timeliness of the request, because those end up being factors that have to be considered with respect to the hardship or burden that's caused by the employer. Counsel, when were final exams? This course, of course, did not have a final exam. But the semester is coming to a close. Certainly the semester is coming to a close. I was looking for something that, I drew an assumption that all this would be done before exams so the students could be preparing to take them and take them. That sounds very reasonable, Your Honor. I can't, I can't say. That's not in the record. I cannot cite it to you off the top of my head, sir, no. I would acknowledge that it certainly would appear that final exams would be sometime after, at the end of the semester, but after the oral arguments. Later April or early May. Yes, yes. I don't know what varies. It's on the same semester system. So yes, I think that it's reasonable to assume that. But I can't give you a date out of the record. With regard to the district court order, do you acknowledge that she, that the district judge used the standard from before the time the Americans with Disabilities Act was amended? I mean, none of the cases she cited reflected the new standard. Well, I had intended, before getting into the questions, to start by saying it's fortunate that this court can affirm, even if on different reasoning than the district judge. That would be a yes. I would acknowledge that she made no reference to the ADAAA. Or cite any cases that reflected the standard. As you know, there are very few cases that had been applying the ADAAA standard at that point. That's your diplomatic way of saying the 11th Circuit hadn't gotten it right either. What I would point to, though, is if you go to the first paragraph in her decision, I believe it's on page 8, where she starts explaining her conclusion. The first line is, plaintiff was not actually disabled, as defined in the ADAA. The third sentence of that paragraph says, an impairment is a disability, quote, if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. That's the revised regulation that was issued post ADAAA. So while she was not citing cases, and I will acknowledge she was incorrect to cite the language about mitigating measures. But that by itself doesn't require reversal on it. I think that she did not seek out and explain why under the ADAAA, he still failed to meet the disability, the standard of a qualified individual with a disability. But she was applying and following the standard of the new regulations. That's how she began her analysis. Is it not pretty clear that under the 08 law, as you just conceded, the court is not supposed to take into consideration that he could have had the surgery and gotten well, like she did. I would acknowledge. She was in error there. I believe that was in error. Is it not pretty clear that that kind of vision problem would create, would qualify her, the plaintiff as disabled? There is certainly an argument for it. And I acknowledge, as I think Mr. Hicks cited, or perhaps Mr. Cooney cited, the EEOC Q&A on the issue that suggested that in many instances, somebody with a single eye would be able. But I would suggest that if we look at the record here, it's always an individualized assessment. And we have an individual that in three semesters of attending law school asked only for the ability to wear sunglasses in one class an additional 90 minutes on final exams in two semesters. And for this extension, we don't know quite how far in advance, of time to file briefing. He didn't ask for any of the things that individuals with vision impairments routinely seek. On the other hand, the one semester that he had both eyes, he had a two, which was satisfactory passing. On every other semester with his eyes, one eye gone, he had less than two, which was failing. And furthermore, the committee, in effect, seemed like to me pretty obviously thought with the disability, he can't make it. In other words, he's not otherwise qualified with his merely one eye. And so also did the academic counselor, Kurtz. She said, you know, so there's a lot of evidence, it seems to me, that he is, in fact, disabled and almost no evidence that he's not disabled. So it seems to me this case turns on that brief issue, the extension of the brief issue. I acknowledge, and that's why I said the fact that the district court got to the decision through a route that I'm not fully comfortable with, is not the end of the case. It does not require reversal on that issue alone. Because I think, A, for the reasons I've explained, apparently not very persuasively, I think one can still find in the record evidence to support the district court conclusion that he's not disabled. But even in the event that this court were to conclude, applying the ADAA standard and suggest that he does meet the definition of an individual with a disability, then we have to look at both the discrimination and the denial of reasonable accommodation. On the discrimination, that would merely shift the burden to us to articulate a legitimate non-discriminatory reason. Certainly. Which is kind of hard to do when you've got this memo in the record saying he's not going to be able to make it because of his physical difficulties. Well, Your Honor, I think there's a little bit of a gotcha going there because the record shows Mr. Cooney walked in and said, let me tell you all the reasons I had a tough semester. I had this health issue. My girlfriend had back surgery. I had a hurricane in New Jersey. I had all these things going on. And so the initial draft of the memo acknowledged all of the things that he had brought up. Because remember, it says physical difficulties. Well, certainly that was among the things that he brought up. Yes, members, no question on that, that it is there. But the concern expressed by a fellow committee member was we aren't supposed to be getting into all the things that he brings up to explain his performance. We're supposed to just be applying the academic. That's all that we're entitled to address. And the handbook says we have to look at that last semester and see if there is a reason to anticipate that he'll do better. And I would respectfully submit that taking that out was, in fact, for the reason that it was expressed. It was beyond their purview. They weren't supposed to be the ones trying to identify if he had good reason. And with respect to the academic counselor, if a counselor can't provide advice to an individual about what might enhance his opportunities for success, it's really a position that shouldn't exist or be filled. He had every right to reject the advice, and obviously he did. And he may contemplate at some point if that was a prudent decision or not. But that was what an academic counselor— With respect to the deference that we owe to the academic decision makers, and I'm thinking in particular about the brief extension. I think the law is to the effect that there is such deference, not conclusive, but there is such deference. Our sample decision, I think, so holds. But it's pretty clear also, at least in other jurisdictions, that that deference applies only if the school or the employer or whoever the defendant is seriously considers the request. And he says in his brief that there was no such serious consideration. I haven't read all of his deposition, but I have read parts of it. And the parts he cites for that proposition don't support it. Does he, in evidence that is properly before the court, does he, is there evidence that the professor did not consider what he was requesting, namely extra time for the brief? I think Mr. Cooney's deposition was that he didn't get into a specific discussion of the amount of time that he needed that week or 10 days because she had—his perception was that she had told him—I think the quoting gives something along the lines of, I'm sorry, I can't help you with the date. And so it doesn't appear that there was further discussion. I would note that the professor's declaration is that she doesn't recall any discussion about a request for an extension. And the inconsistency of the dates makes it, I think, somewhat difficult to assume that he has really put that fact into issue. In other words, what you're saying is that if his request came after April 8th, which was the first day of the oral arguments themselves, there wasn't much to talk about. Certainly that's the case, but I presume that if he made it, it must have been some time, somewhat earlier. Part of his deposition testimony is that there was great concern about a formatting issue and there's a email from the professor to the class indicating that there would be a meeting on April 2nd to discuss formatting. Wild speculation, just because the record doesn't hold together on Mr. Cooney's allegation there, but perhaps there was a time that he brought it up then, several days before. Otherwise, the dates don't make any sense on it. And I see that my time has expired, Your Honor. I think that's exactly right. Thank you very much. Mr. Hicks, you have no time. Thank you. I hope you're going to respond to this timing issue. I hope you're going to respond to this timing issue if the request comes after April 8th. It seems to me you've got a pretty hard road to hoe. Well, I'm happy to point you to evidence that certainly at a minimum raises a factual dispute, but I think actually refutes that pretty well. And this is at page 31 of Mr. Cooney's deposition. It actually says in March 2011 is when Mr. Cooney went to the disability office, which is where he was directed and supposed to go under the handbook, went to the office and discussed it, brought up the appellate. I thought it was pretty clear that he didn't discuss extension of the brief then. He was discussing other things. Am I wrong about that? Not according to his own testimony in the record, which says when I brought up the appellate brief at this March 2011 meeting with the Office of Disability Services, they said I'd have to go talk to my instructor because it's not a test, which I didn't understand. So I think already we have a point at which Mr. Cooney has brought this up to the appropriate individuals. When did he go to see the professor with respect to those April dates? Yes, and so I emailed her something and then I stopped by her office even later and she said, I'm sorry, there's nothing I can do. Later, when are we talking about? What date? Well, the particular date of that email and that conversation I believe is not on the record, but I'll continue on with this. There is an April 8th email. Is there any other email besides the April 8th email when he talks about the sunglasses? No, there's deposition evidence that he did not send a follow-up email about the brief because he had already spoken to her. This is now on page 33. Spoken to her when about the brief? Talking to her before the due date. I think that's the important part. The due date was? The due date was, as my friend says, April 4th, but there's testimony beforehand. So what page of his brief does he say he had talked to the professor about the brief extension before the due date? Well, I don't know the specific page of his brief. I can point you to the specific page in his deposition testimony. That's what I meant. Sure. This is page 33 of his deposition where it says, with regard to the appellate brief, what was the accommodation you asked for? I asked for extra time to submit it being that the appellate brief was almost due. Do you know when the appellate brief was due? Like two weeks after the injury, something like that. Maybe three. Had you started on the appellate brief yet? I had barely started. I wrote maybe three or two or three pages. But what I think that's showing, certainly putting it to a factual dispute, that he asked about this before the brief was due. And then continuing on, because I know this is another colloquy with my friend across the aisle, he said, deposition, he asking about what did she say? Her only answer, aside from there's nothing I can do, was she said, because I had an oral argument against my adversary, she couldn't do that. Because there was a date certain and she couldn't delay it. And I think that we've already heard that there were three dates for oral arguments. The due date for the brief was April 4th. And again, this is a situation where there was literally no accommodation, not even a one day or two day. And as somebody who has written a brief or two, I can say that even a one or two day extension can be awful helpful, particularly, you know, if one is seeking an accommodation for a disability. And if there are no further questions, thank you very much. Mr. Cooney, you have a minute. You're going to use his minute. With your indulgence, Your Honor. Yeah, yeah, yeah. You may use his minute. Pop quiz. Do you have anything else to say? Sure. Well, I'll speak a little bit also. I just want to address in rebuttal, some of the points raised about the actual disability issue. There certainly was 11th Circuit precedent addressing the 2008 amendments at the time this decision was written. It's the Mazzeo decision by this court. I have a site here. This is at 746 Fed Third 1264. And it's very clear, clearly talking about the changes that were made that include that would encompass two of the errors that the district court made regarding actual disability. Number one, looking just at saying that, well, there might not be substantial limitations on one life activity. So therefore, it doesn't count for the rest of them. That's not true anymore, according to the 2008 amendments and Mazzeo. And then number two, of course, the ameliorative effects, which are squarely foreclosed by the 2008 amendments. And I want to point out that there's really almost no dispute about this. In Barry's brief, they bring up this vision exception, which is really their only response to it. And that only has to do with eyeglasses and contact lenses, not major eye surgery. Thank you very much. Thank you, Your Honor. Mr. Hickman, I appreciate your having taken the assignment of court-reporting counsel. You're welcome. Federal Deposit Insurance versus Laddermill.